DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and <br> PEOPLE OF THE VIRGIN ISLANDS, <br><br> v. <br><br> PHILMORE TREVOR ARCHIBALD, <br><br> Defendant. | ) <br> ) <br> )    Criminal Action No. 2015-0041 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant's "Motion to Suppress Identification," filed on January 11, 2016, wherein Defendant argues that the photographic array that led to his identification was unnecessarily suggestive, and that the suggestive identification procedure gave rise to a substantial likelihood of misidentification. (Dkt. No. 7). The Government filed an Opposition on January 22, 2016 (Dkt. No. 10), and an evidentiary hearing was held on February 26, 2016. For the reasons discussed below, the Court will deny Defendant's Motion.

### I.    FACTUAL BACKGROUND[1]

On December 15, 2015, Defendant Philmore Trevor Archibald ("Defendant") was charged, along with one other person, in a four-count Indictment with Carjacking, in violation of

---

[1] The Court bases the factual background in this section on the record established at the suppression hearing. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

18 U.S.C. § 2119(1); Aggravated Rape First Degree, in violation of 14 V.I.C. §§ 1700(c), 1701(a)(2), 1701(a)(3); Kidnapping for Rape, in violation of 14 V.I.C. § 1052(b); and Kidnapping for Robbery, in violation of 14 V.I.C. § 1052(a). (*See* Dkt. No. 1). At a suppression hearing held on February 26, 2016, the Court heard evidence and argument on Defendant's Motion to Suppress Identification. Detective Naomi Joseph of the Virgin Islands Police Department was called to testify by the Government. Officer Robert Combie of the Virgin Islands Police Department and S.S., one of the victims in this case, were called to testify by the defense. The following facts emerged from the record established at the hearing. (Dkt. No. 52 (Suppression Hr'g Tr.)).

Detective Naomi Joseph, who has been employed with the Virgin Islands Police Department for thirty years, testified that just before midnight on September 17, 2015, a heterosexual couple—S.S., the female, and T.P., the male—were leaving an apartment on the third floor of building 55 of the Mutual Homes housing community on St. Croix, Virgin Islands. (Dkt. No. 52 at 6-7). In the vicinity of the building's staircase, S.S. and T.P. were approached at knife-point by two black males—one light-skinned with dreadlocks and the other dark-skinned with a short afro—who demanded money from them. (*Id*.). The men took and searched S.S.'s bag, but found only $5.00 in cash and a small amount of "hash." (*Id*. at 7-8).

The men forced S.S. and T.P.—at knife-point—down the stairs to S.S. and T.P.'s vehicle. (*Id*. at 8). Both S.S. and T.P. were forced into the back seat. (*Id*.). Defendant—described as "the big guy"—also got into the back seat and sat in between S.S. and T.P. (*Id*. at 8-9). The other male, who has been identified as Sixtus Emmanuel ("Emmanuel"), got into the front driver's seat and drove the vehicle out of the housing community. (*Id*.). For the next hour and a half, S.S. and T.P. were physically and sexually assaulted by both men inside and outside of the vehicle. (*Id*. at 9-12).

2

T.P. was able to escape during an unsuccessful attempt by Emmanuel to have T.P. withdraw money from an ATM machine at the Sunny Isle shopping center. (*Id*. at 13-16). T.P. then called 911 around 1:15 a.m. on the morning of September 18, 2015 to report the incident. (*Id*. at 17). Meanwhile, S.S. escaped from the vehicle in a residential area, and called 911 around 1:34 a.m. that same morning. (*Id*. at 19-20). The police responded and took S.S. to the hospital where she met Detective Joseph. (*Id*. at 20).[2]

At the hospital, Detective Joseph got a description of Defendant and Emmanuel from S.S. (*Id*. at 21).[3] S.S. described Emmanuel as young—in his early twenties—dark-skinned and slender with a short afro. (*Id*.). She described Defendant as a tall, light-skinned, medium-built black male with dreadlocks. (*Id*.).[4] She said he had tattoos on his arms and that she remembered the star of David—the six-point star—and hieroglyphics on one of his forearms. (*Id*.). S.S. informed Detective Joseph that she had seen Defendant earlier in the day on September 17, 2015 standing in front of building 55. (*Id*.). She explained that on her way back from the community center with her roommate, Defendant hissed at her trying to get her attention. (*Id*. at 22). She said that Defendant told her that she looked good. (*Id*.). Out of courtesy, S.S. stated that she waved, but kept walking towards her apartment. (*Id*.).

On September 22, 2015, Detective Joseph received a tip from a concerned citizen who informed her that one of the suspects was a sex offender who had recently been released from jail on a rape conviction, and that his name was Philmore Archibald. (*Id*.). Upon learning this

---

[2] T.P. also met Detective Joseph at the hospital. (Dkt. No. 52 at 20).

[3] T.P. also gave a description of Defendant and Emmanuel to Detective Joseph. However, at the suppression hearing, Detective Joseph explained that S.S. gave a "more clear and concise" description of the suspects. (Dkt. No. 52 at 48).

[4] At the suppression hearing, Officer Combie, who has been employed with the Virgin Islands Police Department for two years, testified that he and his partner, Officer Joshua Williams, were dispatched to the gas station where T.P. was located in the early morning of September 18, 2015, and that during his conversation with T.P., T.P. described his attackers as two dark-skinned males—one with dreadlocks, a beard, mustache, and sideburns and the other clean-shaven. (Dkt. No. 52 at 131-33).

3

information, Detective Joseph testified that she searched the sex offender registry with the name she was provided and discovered "a red skin Rasta male, medium built with the star of David and [] writings on [his] arms." (*Id*. at 23). Detective Joseph explained that the individual on the registry matched the name she received from the concerned citizen and the description she received from S.S., including the location of the tattoos on his body. (*Id*.). At the suppression hearing, Detective Joseph identified Defendant as the individual she saw on the sex offender registry. (*Id*. at 24).

Around 9:00 p.m. on September 23, 2015, Detective Joseph, along with three other VIPD officers, went to the Mutual Homes housing community looking for Defendant. (*Id*. at 24-25, 86). They located him sitting on a wall by building 49 with two other men drinking alcohol. (*Id*. at 25-26). Detective Joseph testified that as she and the other officers approached Defendant, she saw that he had his name, Philmore, and a six-point star tattooed on his arm. (*Id*. at 29). She asked him to identify himself. (*Id*.). He responded, twice, that his name was Kareem. (*Id*.). Detective Joseph testified that she explained to Defendant that she wanted to speak with him and asked that he come with her over to the police car. (*Id*.). Defendant complied. (*Id*.). At the police car, one of the officers asked Defendant again to identify himself. (*Id*.). Defendant responded loudly by cursing and saying, *inter alia*, "I ain't rape nobody." (*Id*.).[5]

Because a crowd began to gather, the officers decided to leave the housing community with Defendant. (*Id*. at 30). The officers drove Defendant to the Wilbur Francis Police Headquarters in Frederiksted. (*Id*. at 30-31). When Defendant arrived at the police station, Detective Joseph explained to him that he was a suspect in a rape case that occurred in the Mutual Homes housing community, and that to eliminate him as a suspect she needed his

---

[5] On cross-examination, Detective Joseph explained that Defendant told her that he knew he would be identified as a suspect in the rape case because he is a sex offender, and that he knew officers would come to speak to him about the rape. (Dkt. No. 52 at 89).

photograph and DNA. (*Id.* at 31). Defendant signed two authorization forms—one for the photograph and the other for the DNA sample. (*Id.* at 32). Detective Joseph testified that she told Defendant that the photograph would be used in a photo array and shown to the rape victims. (*Id.*).

The photograph of Defendant was in fact used in a photo array with five other photographs. (*Id.* at 37, 39). Detective Joseph testified that the other photographs depicted individuals that had similar characteristics to Defendant—including, dreadlocks, complexion, and facial hair. (*Id.*). At the suppression hearing, Detective Joseph stated that she searched for individuals with light skin who looked similar to Defendant. (*Id.* at 38). Detective Joseph also explained that the photo array was originally in color, but that she converted it to black and white to ensure that none of the photographs stood out when compared with others. (*Id.* at 39).

On September 24, 2015, the photo array in which Defendant's photograph was included was shown to S.S. and T.P. (*Id.*).[6] Detective Joseph testified that she called S.S. and T.P. on that date and asked them to go to the police station. (*Id.*). When they arrived, she placed them in different rooms. (*Id.* at 40). S.S. was shown the photo array first. (*Id.*). Detective Joseph testified that she explained to S.S. that she could not tell S.S. whether the person who attacked her was in fact in the photo array. (*Id.*). She further testified that she told S.S. that she was not under any obligation to pick anyone,[7] and that she should take her time, review the photos, and if she sees anybody she remembers from the night of the attack, to circle the number under that individual's photograph. (*Id.*). Detective Joseph explained that a form was given to S.S. that provided a space for S.S. to write a brief synopsis of where she encountered the individual she circled on the photo

---

[6] A photo array was also shown to S.S. and T.P. on September 21, 2015. (Dkt. No. 52 at 147). Detective Joseph testified that S.S. was shown a photo array of the other suspect in this case—the dark-skinned male. (*Id.*). However, S.S. was unable to select an individual from the array. (*Id.*).

[7] On direct examination by counsel for Defendant, S.S. corroborated that Detective Joseph did not pressure her to select someone from the photo array. (*See* Dkt. No. 52 at 144 ("I was told that . . . if I don't, I don't. And if I do, I do.")).

5

array, and what, if anything, happened during that encounter. (*Id*.).

Detective Joseph testified that S.S. had an immediate reaction to the photo array. (*Id*. at 41). She started shaking, crying, and stated "Oh, my God. Oh, my God. He's here. He's here. He's here. It's him. It's him." (*Id*.). S.S. selected photograph number 2 from the photo array—the photograph of Defendant. (*Id*.).[8] She then filled out the form and signed her name. (*Id*.). At the suppression hearing, Detective Joseph identified Defendant as the individual S.S. selected from the photo array. (*Id*. at 49).[9]

Later in the day on September 24, 2015, Defendant, at his own request, was picked up by Detective Joseph and two other officers and brought to the police station. (*Id*. at 44-45).[10] Once at the police station, Detective Joseph informed Defendant that his photograph was shown to S.S. and that she immediately selected him as the person who attacked her and her boyfriend, T.P., on September 17 and 18, 2015. (*Id*. at 47). Based on the identification, Defendant was arrested and charged with carjacking, kidnapping, rape, and robbery. (*Id*. at 48).

## II.  DISCUSSION

### A.  Applicable Legal Principles

An identification procedure that is both "(1) unnecessarily suggestive and (2) creates a substantial risk of misidentification" violates a defendant's Fifth Amendment right to due process. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107-08 (1977)). "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *Id*. (quoting

---

[8] At the suppression hearing, S.S. testified that she was one hundred percent confident that the person she selected from the photo array was the person who assaulted her. (Dkt. No. 52 at 145).

[9] T.P. was also shown the photo array. (Dkt. No. 52 at 48). However, he was unable to select anyone. (*Id*.).

[10] Detective Joseph testified that Defendant called her on September 24, 2015 to find out if there was anything he could do to help, and requested that she pick him up. (Dkt. No. 52 at 44-45).

*United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)). "An impermissibly suggestive identification procedure can occur in four settings: a show-up, a photo array, a line-up and in court." *Id.* (citing *Identifications*, 34 GEO. L.J. ANN. REV. CRIM. PROC. 149, 153 n.496 (2005)). The identification procedure at issue here is a photo array.

The use of a photo array may violate due process "when police attempt to emphasize the photograph of a given suspect, or when circumstances surrounding the array unduly suggest who an identifying witness should select." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); *see also United States v. Ladson*, 238 F. App'x 874, 877 (3d Cir. 2007). However, "[a] photographic array is not unnecessarily suggestive solely because certain characteristics of a defendant or photograph set him apart from the other persons pictured in the array." *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (citing *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991)). "The key question is whether differences in characteristics 'sufficiently distinguish' a defendant to suggest culpability." *Id.* (quoting *Reese*, 946 F.2d at 260).

"In evaluating the suggestiveness of a photographic array, [the court must] examine the totality of the circumstances to determine whether the array's suggestiveness denied the defendant due process." *Lawrence*, 349 F.3d at 115 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Specifically, the court considers "several factors, including the size of the array, its manner of presentation, and its contents." *Reese*, 946 F.2d at 260. The defendant bears the burden of proving that the photo array was unnecessarily suggestive. *Lawrence*, 349 F.3d at 115; *see also United States v. Clausen*, 328 F.3d 708, 713 (3d Cir. 2003).

An unnecessarily suggestive photo array alone "does not in itself require exclusion of the evidence." *Reese*, 946 F.2d at 259 (quoting *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd*, 493 U.S. 342 (1990) (internal quotation marks omitted)). "A court should suppress

an identification only where 'the photographic identification procedure was so [] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Burnett*, 773 F.3d at 133 (quoting *Simmons*, 390 U.S. at 384). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Stevens*, 935 F.2d at 1391 (quoting *Brathwaite*, 432 U.S. at 114 (internal quotation marks omitted).

To determine whether an identification was reliable despite an impermissibly suggestive procedure, the court must consider the totality of the circumstances, including:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Brownlee*, 454 F.3d at 139 (citing *Biggers*, 409 U.S. at 198-99). The Supreme Court has noted that "courts should not reach the reliability inquiry unless the identification resulted from a situation created by improper police conduct." *United States v. Shavers*, 693 F.3d 363, 382 (3d Cir. 2012) (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012)); *see also United States v. Roland*, 545 F. App'x 108, 114 (3d Cir. 2013) (citing *Stevens*, 935 F.2d at 1389) (stating that the court need only engage in the "totality of the circumstances" analysis if the identification procedure was unnecessarily or impermissibly suggestive); *United States v. Smith*, 505 F. App'x 149, 152 (3d Cir. 2012) ("Only if a procedure was too suggestive need a court ask whether it should nonetheless be admitted as reliable under the totality of the circumstances." (citing *Biggers*, 409 U.S. at 199)).

In sum, the court must engage in a two-step inquiry to determine "(1) whether the identification process was unduly suggestive and, if so, (2) whether the totality of the circumstances nonetheless renders the identification reliable." *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005).

## B. Analysis

In the instant case, Defendant contends that the photo array that led to his identification was unnecessarily suggestive for two reasons. First, he argues that the placement of his photo in the photo array between two individuals who cannot be described as light-skinned "highlighted [him] as the culprit." (Dkt. No. 7 at 5). According to Defendant, "there is only one other person in the array that . . . possibly meets the description [of a tall, light-skinned individual with dreadlocks]." (*Id*. at 4). Second, Defendant claims that he is pictured in the photo array with four individuals who are noticeably smaller in size. (Dkt. No. 52 at 156). He views himself as "considerably bigger" than all but one individual in the photo array. (*Id*. at 155-56). Neither of these arguments, either singly or in combination, lead the Court to conclude that the photo array was unnecessarily suggestive.

Each of the photos in the black and white photo array depict an African American male in either a white or black t-shirt with dreadlocks. Five of the six individuals depicted, including Defendant, have facial hair—either a goatee or a mustache—and all of the individuals appear to be of similar age and of relatively the same complexion and build.[11] To the extent that the two individuals depicted in the photographs on either side of Defendant, or others, appear slightly darker in complexion, the Court does not find that this difference is striking or otherwise suggestive of whom should be selected. *See United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (affirming district court's finding that photo array was not unduly suggestive, and noting that the district court found that "the skin color of the members of the array was not strikingly different"). The Court finds similarly unremarkable any alleged differences in the size of those photographed in the array.

---

[11] The photo array in this case is similar to the one reviewed by the Third Circuit in *United States v. Mathis*, 264 F.3d 321 (3d Cir. 2001), in that the array "portrays only the subjects' heads and necks, making their general physiques very difficult to estimate." *Id*. at 333.

"Minor differences[,] such as fullness of face, size of head, or complexion, are not indicia of suggestiveness, much less undue suggestiveness[.]" *United States v. Wrensford*, 2014 U.S. Dist. LEXIS 38078, at *10 (D.V.I. Mar. 24, 2014).[12] "[T]he primary question is whether the suspect's picture is so different from the rest that it suggests culpability." *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991). That is not the case here. Any slight differences in the appearances of those depicted are negligible and do not rise to the level of being unduly suggestive, or create a substantial risk of misidentification. *See United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006). Accordingly, the Court concludes that Defendant has failed to prove that the content of the photo array was unnecessarily suggestive.

In addition to evaluating the content of the photo array, the Court must also consider the manner in which the array was presented to the witness. *See United States v. Sanders*, 275 F. App'x 121, 124 (3d Cir. 2008). Here, the testimony of Detective Joseph and S.S. indicate that the photo array was not presented in a suggestive manner. Detective Joseph testified that she placed S.S. and T.P. in separate rooms at the police station in order to show them the photo array individually. (*See* Dkt. No. 52 at 39). She further testified that she explained to S.S. that she could not tell S.S. whether the person who attacked her was in fact in the photo array, and specifically advised S.S. that she was not under any obligation to select someone from the photo array. (*See id*. at 40). This account was corroborated by S.S. who testified that she was told by Detective Joseph that if she made an identification, she did, and if she didn't, she didn't. (*See* Dkt. No. 52 at 144). Accordingly, the Court concludes that the manner in which the photo array was presented was not suggestive, let alone unnecessarily suggestive.

---

[12] *See, e.g.*, *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991) (holding a photographic array was not unnecessarily suggestive when the defendant was the only person pictured with sideburns and a card with his name and height); *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988) (finding that the fact that the defendant was the only person in a six-person array who wore a red t-shirt was not unduly suggestive when other men also wore colored t-shirts and "were comparable in dress and appearance").

Even if one were to assume that the photo array and/or the identification procedure were unnecessarily suggestive, under the totality of the circumstances, the identification by S.S. would still be admissible based on its reliability.[13] In other words, any impermissible suggestivity would not "give rise to a very substantial likelihood of irreparable misidentification," *Burnett*, 773 F.3d at 133, in view of the underlying reliability of the identification. In reaching this conclusion, the Court has considered several factors, including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Brownlee*, 454 F.3d at 139 (quoting *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

Here, S.S. had ample opportunity to view Defendant at close range at the time of the crime. In *Reese v. Fulcomer*, 946 F.2d 247 (3d Cir. 1991), the Third Circuit noted that "rape victims usually have a better opportunity to observe their assailants than victims or witnesses of other crimes." *Id*. at 262 (internal citation and quotation marks omitted). In this case, S.S. spent approximately one hour and a half in the back seat of a vehicle with Defendant, and was repeatedly raped by him throughout that time period. In addition, S.S. had an opportunity to observe Defendant in a calm environment before the kidnapping and rape. At the suppression hearing, Detective Joseph testified that S.S. had a brief encounter with Defendant the day of the kidnapping when he attempted to get her attention by hissing at her and telling her that she looked good. (*See* Dkt. No. 52 at 22).

S.S.'s description of Defendant to Detective Joseph immediately after the incident at the hospital indicates that she was paying close attention to Defendant. Detective Joseph testified

---

[13] Apparently believing that a reliability determination under a totality of the circumstances analysis would result in a favorable ruling for Defendant, counsel for Defendant "suggest[ed] to [the] Court that the Court should make a finding with regard to reliability [regardless of its conclusion as to suggestivity]." (Dkt. No. 52 at 60). As discussed below, the Court's conclusion remains unchanged.

that S.S. gave a clear and concise description of Defendant, including a description of the six-point star and hieroglyphic tattoos on his forearm. (*See* Dkt. No. 52 at 48).[14] Additionally, S.S. positively identified Defendant shortly after the crime was committed—i.e., seven days after the crime. *Cf. Biggers*, 409 U.S. at 201 (finding that there was "no substantial likelihood of misidentification" when the identification occurred seven months after the crime). Finally, S.S. identified Defendant without hesitation, was "visibly shaken" upon seeing Defendant's photograph in the photo array, and testified that she was one hundred percent confident that the person she selected from the photo array was the person who assaulted her. (*See* Dkt. No. 52 at 145). Accordingly, upon consideration of the totality of the circumstances, the Court concludes that S.S.'s identification of Defendant based on the photo array was reliable.[15]

### III. CONCLUSION

Because the Court concludes that neither the photo array nor the identification procedure were unnecessarily suggestive and, in any event, under the totality of the circumstances, S.S.'s identification was reliable, the Court will deny Defendant's "Motion to Suppress Identification." (Dkt. No. 7).

An appropriate Order accompanies this Memorandum Opinion.

Date: April 14, 2016  _____/s/_____
                      WILMA A. LEWIS
                      Chief Judge

---

[14] While Defendant argues that T.P. gave Officer Combie a significantly different description of Defendant from the description S.S. gave to Detective Joseph, the Court finds that this argument goes to the weight of the evidence, not the admissibility of S.S.'s identification of Defendant.

[15] The Court finds wholly unpersuasive, and therefore rejects, Defendant's argument at the suppression hearing that S.S.'s failure to describe Defendant as "big" renders her identification unreliable. (Dkt. No. 52 at 159).