## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| PEOPLE OF THE VIRGIN ISLANDS, | ) | |
| | ) | **Criminal Action No. 2015-0041** |
| v. | ) | |
| | ) | |
| PHILMORE TREVOR ARCHIBALD, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant's "Motion to Suppress Physical Evidence and Statements," filed on February 16, 2016, wherein Defendant seeks to suppress: (1) his statements made on September 23, 2015; (2) photographs taken on September 23, 2015; (3) DNA samples provided on September 23, 2015; (4) his cell phone—and its contents—seized on September 24, 2015; and (5) his statements made on September 24, 2015. (*See* Dkt. No. 21). The Government filed an Opposition on February 25, 2016 (Dkt. No. 29), and an evidentiary hearing was held on April 15, 2016. For the reasons discussed below, the Court will deny Defendant's Motion.

# I.   FACTUAL BACKGROUND[1]

On December 15, 2015, Defendant Philmore Trevor Archibald ("Defendant") was charged in a four-count Indictment, along with one other person, with Carjacking, in violation of 18 U.S.C. § 2119(1); Aggravated Rape First Degree, in violation of 14 V.I.C. §§ 1700(c), 1701(a)(2), 1701(a)(3); Kidnapping for Rape, in violation of 14 V.I.C. § 1052(b); and Kidnapping for Robbery, in violation of 14 V.I.C. § 1052(a). (*See* Dkt. No. 1). At a suppression hearing held on April 15, 2016, the parties, relying on the factual record established at a suppression hearing held on February 26, 2016 (*see* Dkt. No. 52 (Suppression Hr'g Tr.),[2] presented oral argument on Defendant's "Motion to Suppress Physical Evidence and Statements." The facts, according to Detective Naomi Joseph of the Virgin Islands Police Department, the sole witness called by the Government to testify at the February 26, 2016 hearing, are as follows.[3]

Detective Naomi Joseph, who has been employed with the Virgin Islands Police Department ("VIPD") for thirty years, testified that just before midnight on September 17, 2015, a heterosexual couple—S.S., the female, and T.P., the male—were leaving an apartment on the third floor of building 55 of the Mutual Homes housing community in Estate Grove Place ("Grove") on St. Croix, Virgin Islands. (Dkt. No. 52 at 6-7). In the vicinity of the building's staircase, S.S. and T.P. were approached at knife-point by two black males—one light-skinned with dreadlocks and the other dark-skinned with a short afro—who demanded money from them.

---

[1] The Court bases the factual background in this section on the record established at a suppression hearing held on February 26, 2016. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] The February 26, 2016 suppression hearing addressed Defendant's "Motion to Suppress Identification" (Dkt. No. 7), which was denied by Order of the Court on April 14, 2016 (Dkt. No. 60).

[3] Officer Robert Combie of the Virgin Islands Police Department and S.S., one of the victims in this case, were called by the defense to testify at the February 26, 2016 hearing. However, their testimony is not relevant to the instant Motion to Suppress. Therefore, the Court will not include their testimony in the following factual discussion.

(*Id.*).  The men took and searched S.S.'s bag, but found only $5.00 in cash and a small amount of "hash." (*Id.* at 7-8).

The men forced S.S. and T.P.—at knife-point—down the stairs to S.S. and T.P.'s vehicle. (*Id.* at 8). Both S.S. and T.P. were forced into the back seat. (*Id.*). Defendant—described as "the big guy"—also got into the back seat and sat in between S.S. and T.P. (*Id.* at 8-9). The other male, who has been identified as Sixtus Emmanuel ("Emmanuel"), got into the front driver's seat and drove the vehicle out of the housing community. (*Id.*). For the next hour and a half, S.S. and T.P. were physically and sexually assaulted by both men inside and outside of the vehicle. (*Id.* at 9-12).

T.P. was able to escape during an unsuccessful attempt by Emmanuel to have T.P. withdraw money from an ATM machine at the Sunny Isle shopping center. (*Id.* at 13-16). T.P. then called 911 around 1:15 a.m. on the morning of September 18, 2015 to report the incident. (*Id.* at 17). Meanwhile, S.S. escaped from the vehicle in a residential area, and called 911 around 1:34 a.m. that same morning. (*Id.* at 19-20). The police responded and took S.S. to the hospital where she met Detective Joseph. (*Id.* at 20).[4]

At the hospital, Detective Joseph got a description of Defendant and Emmanuel from S.S. (*Id.* at 21).[5] S.S. described Emmanuel as young—in his early twenties—dark-skinned and slender with a short afro. (*Id.*). She described Defendant as a tall, light-skinned, medium-built black male with dreadlocks. (*Id.*). She said he had tattoos on his arms and that she remembered the star of David—the six-point star—and hieroglyphics on one of his forearms. (*Id.*). S.S. informed Detective Joseph that she had seen Defendant earlier in the day on September 17, 2015 standing in front of building 55. (*Id.*). She explained that on her way back from the community center with

---

[4] T.P. also met Detective Joseph at the hospital. (Dkt. No. 52 at 20).

[5] T.P. also gave a description of Defendant and Emmanuel to Detective Joseph. However, at the suppression hearing, Detective Joseph explained that S.S. gave a "more clear and concise" description of the suspects. (Dkt. No. 52 at 48).

her roommate, Defendant hissed at her trying to get her attention. (*Id.* at 22). She said that Defendant told her that she looked good. (*Id.*). Out of courtesy, S.S. stated that she waved, but kept walking towards her apartment. (*Id.*).

On September 22, 2015, Detective Joseph received a tip from a concerned citizen who informed her that one of the suspects was a sex offender who had recently been released from jail on a rape conviction, and that his name was Philmore Archibald. (*Id.*). Upon learning this information, Detective Joseph testified that she searched the sex offender registry with the name she was provided and discovered a photograph of "a red skin Rasta male, medium built with the star of David and [] writings on [his] arms." (*Id.* at 23). Detective Joseph explained that the photograph of the individual on the registry matched the name she received from the concerned citizen and the description she received from S.S., including the location of the tattoos on his body. (*Id.*).[6] At the suppression hearing, Detective Joseph identified Defendant as the individual she saw on the sex offender registry. (*Id.* at 24).

Around 9:00 p.m. on September 23, 2015, Detective Joseph, along with three other VIPD officers, went to the Mutual Homes housing community looking for Defendant. (*Id.* at 24-25, 86). They located him sitting on a wall by building 49 with two other men drinking alcohol. (*Id.* at 25-26). Detective Joseph testified that, once she and the other officers spotted Defendant, they parked the police car and exited the vehicle. (*Id.* at 28). None of the officers had their guns drawn. (*Id.* at 28, 114).

---

[6] Detective Joseph also testified that the photograph of the individual on the registry matched information she received on September 21, 2015 from members of the Mutual Homes housing community—i.e., the name Philmore. (Dkt. No. 52 at 104).

Detective Joseph, as the lead officer, approached Defendant—and the two other men—first. (*Id*. at 28).[7] She introduced herself as Naomi Joseph, a sergeant with the police department; introduced the three other VIPD officers; and asked Defendant and the two other men to identify themselves. (*Id*.). Detective Joseph testified that the two men with Defendant immediately identified themselves, and that Defendant initially stated "let me be," (*id*. at 86), but later stated that his name was Kareem (*id*. at 28). Knowing that Defendant was not being honest about his name,[8] Detective Joseph asked him again to identify himself. (*Id*. at 29). Defendant again responded that his name was Kareem. (*Id*.).[9]

Detective Joseph testified that Defendant then began to curse, stating: "What the F you want. Meh son, I sick of this, S." (*Id*.). She explained to Defendant in a "calm and cool" voice that she wanted to speak with him and asked that he come with her over to the police car. (*Id*. at 29, 87, 112). Defendant complied. (*Id*. at 29). At the police car, one of the officers asked Defendant again to identify himself. (*Id*.). Defendant responded loudly by cursing and saying, *inter alia*, "I ain't rape nobody." (*Id*.).[10] Detective Joseph testified that she stated to Defendant: "Nobody ain't tell you nothing about rape. We just asking you your name." (*Id*.).

Detective Joseph testified further that she spoke with Defendant for no more than five minutes before a crowd began to gather. (*Id*. at 91). In the interest of safety, the officers decided

---

[7] Detective Joseph testified that neither she nor the other officers surrounded Defendant when they approached him by the wall. (Dkt. No. 52 at 114).

[8] Detective Joseph explained that when she initially approached Defendant, she saw that he had his name, Philmore, and a six-point star tattooed on his arm. (Dkt. No. 52 at 29, 106).

[9] On cross-examination, Detective Joseph admitted that she did not document in the report that she prepared of her encounter with Defendant on September 23, 2015 that Defendant stated that his name was Kareem. (Dkt. No. 52 at 85). She affirmed that she wrote in her report that Defendant refused to give his name. (*Id*.).

[10] On cross-examination, Detective Joseph explained that Defendant told her that he knew he would be identified as a suspect in the rape case because he is a sex offender, and that he knew officers would come to speak to him about the rape. (Dkt. No. 52 at 89).

to leave the Mutual Homes housing community with Defendant. (*Id*. at 30).[11] Detective Joseph testified that she remembered telling Defendant "two or three times" that he was not under arrest. (*Id*. at 30-31).[12] However, "as a matter of procedure," Defendant was frisked, handcuffed, and placed in the police car. (*Id*. at 30, 91). The officers drove Defendant to the Wilbur Francis Police Headquarters in Frederiksted. (*Id*. at 30-31, 91). Upon arrival at the police station, Defendant was uncuffed. (*Id*. at 31).

Detective Joseph testified that, while at the police station, she asked Defendant where he lived, and he told her that he "lives in Grove." (*Id*. at 32).[13] Detective Joseph testified further that she did not ask Defendant any questions about the incident that occurred at Mutual Homes on September 17 and 18, 2015. (*Id*. at 32-33). Rather, she explained to Defendant that he was a suspect in a rape case that occurred in the Mutual Homes housing community, and that to eliminate him as a suspect she needed his photograph and DNA. (*Id*. at 31, 88).

According to Detective Joseph, Defendant asked her what would happen if he did not give her a photograph or DNA sample. (*Id*. at 31, 92). Detective Joseph explained: "[I]f you don't want to give it to me, it's okay," but "I will go to the court and get a court order ordering you to give it to me." (*Id*. at 113, 31). Defendant responded: "So, you going [to] get it anyway?" (*Id*.). Detective Joseph answered in the affirmative. (*Id*.). According to Detective Joseph, Defendant stated: "If you're going to get it anyway, I going to give it to you." (*Id*. at 31-32).

---

[11] Detective Joseph stated at the suppression hearing that the VIPD has "had situations in Mutual Homes before where mini riots broke out," specifically stones had been thrown at the police and "a police car was shot up." (Dkt. No. 52 at 30).

[12] Detective Joseph later testified that one of the other officers that accompanied her to Mutual Homes also told Defendant that he was not under arrest. (Dkt. No. 52 at 33).

[13] On cross-examination, Detective Joseph testified that her search of the sex offender registry revealed that Defendant lived in the Mutual Homes housing community, located in Grove. (Dkt. No. 52 89-90). Edward Thomas ("Mr. Thomas"), the sex offender registrar for St. Croix, had also confirmed that Defendant had an address in Mutual Homes. (*Id*. at 90).

Defendant signed two authorization forms—one for the photograph and the other for the DNA sample. (*Id*. at 32). He then proceeded to swab the inside of his mouth for DNA, and a photograph was taken of him. (*Id*.). Detective Joseph testified that she told Defendant that his photograph would be used in a photo array and shown to the rape victims. (*Id*.). She also told him that if the victims did not pick his photograph from the photo array, then he would not hear from her again; if they did, then he would. (*Id*.). Once Defendant provided his DNA sample and his photograph, Detective Joseph testified that she and other VIPD officers took Defendant back to Grove—near a fire station, which is where Defendant asked to be taken. (*Id*. at 37).

On September 24, 2015, the photo array, in which Defendant's photograph was included, was shown to S.S. and T.P. (*Id*. at 39-40).[14] Detective Joseph testified that she called S.S. and T.P. on that date and asked them to go to the police station. (*Id*. at 39). When they arrived, she separated them and placed them in different rooms. (*Id*. at 40). S.S. was shown the photo array first. (*Id*.). Detective Joseph explained that a form was given to S.S. that provided a space for S.S. to write a brief synopsis of where she encountered the individual she selected—if she selected someone—[15] and what, if anything, happened during that encounter. (*Id*.).

Detective Joseph testified that S.S. had an immediate reaction to the photo array. (*Id*. at 41). She started shaking and crying, and stated: "Oh, my God. Oh, my God. He's here. He's here. He's here. It's him. It's him." (*Id*.). S.S. selected photograph number 2 from the photo array—the photograph of Defendant. (*Id*.). She then filled out the form and signed her name. (*Id*.). At the

---

[14] A photo array was also shown to S.S. on September 21, 2015, which included the other suspect in this case—the dark-skinned male. (Dkt. No. 52 at 147). However, S.S. was unable to select an individual from the array. (*Id*.).

[15] Detective Joseph testified that she explained to S.S. that she could not tell S.S. whether the person who attacked her was in fact in the photo array. (Dkt. No. 52 at 40).

suppression hearing, Detective Joseph identified Defendant as the individual S.S. selected from the photo array. (*Id*. at 49-50).[16]

Later in the day on September 24, 2015, Defendant, at his own request, was picked up by Detective Joseph and two other officers and brought to the police station. (*Id*. at 44-45).[17] Once at the police station, Defendant was advised of his rights; signed an "Advice of Rights" form; stated that he understood his rights; and waived his *Miranda* rights. (*Id*. at 45). He was then asked by Detective Joseph what he did the night of September 17, 2015 and the early morning of September 18, 2015. (*Id*.). His statement was videotaped. (*Id*. at 47). During his statement, Detective Joseph informed Defendant that his photograph was shown to S.S. and that she immediately selected him as the person who attacked her and her boyfriend, T.P., on September 17 and 18, 2015. (*Id*.). Based on the identification, Defendant was arrested and charged with carjacking, kidnapping, rape, and robbery. (*Id*. at 48).

Upon his arrest, a cell phone and keys were recovered from Defendant. (*Id*. at 49). Detective Joseph testified that she obtained a warrant to search the cell phone for any photographs or communication between Defendant and the other suspect in this case—Emmanuel. (*Id*.). The results of the search are not part of the record.

## II.    DISCUSSION

### A.  Fourth Amendment

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV; *see also* 48 U.S.C. § 1561 (section of the Revised Organic Act that makes the Fourth Amendment applicable to the Virgin Islands). "Warrantless searches and seizures are

---

[16] T.P. was also shown the photo array. (Dkt. No. 52 at 48). However, he was unable to select anyone. (*Id*.).

[17] Detective Joseph testified that Defendant called her on September 24, 2015 to find out if there was anything he could do to help, and requested that she pick him up. (Dkt. No. 52 at 44-45).

presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). Evidence obtained as a result of an unreasonable search and seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as the result of an unlawful search and seizure).

### 1. Seizures under the Fourth Amendment

Although law enforcement officers ordinarily must obtain a warrant based on probable cause before conducting a seizure, in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court articulated an exception that allows police officers to conduct a brief investigatory stop in limited circumstances. Under *Terry* and its progeny, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The reasonable suspicion that justifies the *Terry* stop of a suspect also justifies a subsequent protective frisk of that suspect, where officers have reason to believe that the suspect may pose a danger to the officers. *Terry*, 392 U.S. at 30.

In assessing the legality of a *Terry* stop, the Court must first pinpoint the "moment of seizure" and then determine "whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity." *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (quoting *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (internal quotation marks omitted)); *see also United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014). The Supreme Court has stated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (stating that "[a] seizure occurs whenever an officer restrains the freedom of a person to walk away") (citation and internal quotation marks omitted).

The Supreme Court has clarified that the "free to leave" analysis is not applicable in situations where an individual's "freedom of movement was restricted by a factor independent of police conduct[,]" *Florida v. Bostick*, 501 U.S. 429, 436 (1991), such as when the person "has no desire to leave," *id.* at 435. Under such circumstances, the appropriate inquiry is whether a reasonable person would feel free to "'disregard the police and go about his business,' or ultimately 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter' . . . ." *United States v. Kim*, 27 F.3d 947, 951 (3d Cir. 1994) (quoting *Bostick*, 501 U.S. at 434, 436).

It is well-established that a Fourth Amendment "'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Bostick*, 501 U.S. at 434). Such an encounter, that is short in duration, is characterized as "consensual" and does not amount to a Fourth Amendment seizure because "the citizen has the ability to engage in or terminate the encounter." *Id.* (citing *United States v. Wilson*, 413 F.3d 382, 386-87 (3d Cir. 2005)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [the court] conclude that a 'seizure' has occurred." *Bostick*, 501 U.S. at 434 (quoting *Terry*, 392 U.S. at 20 n.16); *see also Berg v. Cnty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

The Government does not dispute that Defendant was "seized" within the meaning of the Fourth Amendment. (*See* Dkt. No. 29 at 4).[18] It argues, rather, that "there was reasonable[,] articulable suspicion to stop Defendant." (*Id.*). Nonetheless, the Court must determine when the seizure of Defendant occurred, "as that is the moment 'the Fourth Amendment becomes relevant.'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *Terry*, 392 U.S. at 16); *see also Campbell*, 332 F.3d at 205. "Only then can [the Court] evaluate the presence or absence of reasonable suspicion, as [the Court] must consider only 'the facts available to the officer at the moment of the seizure.'" *Brown*, 448 F.3d at 245 (quoting *Terry*, 392 U.S. at 21-22).[19]

There is no allegation in this case that Detective Joseph or any of the other VIPD officers exerted physical force over Defendant. The allegation is that the officers seized Defendant by virtue of a show of authority. The issue before the Court, then, is whether the officers made a show of authority sufficient to constitute a seizure and, if so, whether Defendant submitted to that show of authority. *See United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009) ("The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized."); *see also Brown*, 448 F.3d at 245 ("A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) *submission* to 'a show of authority.'") (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis added)).

---

[18] At the suppression hearing held on April 15, 2016, the Government represented that it is not challenging the fact that Defendant was seized.

[19] At the suppression hearing held on April 15, 2016, Defendant argued that the encounter between Defendant and Detective Joseph was not a *Terry* stop because Detective Joseph testified that her purpose for visiting Mutual Homes on September 23, 2015 was to "get a current photograph" of Defendant and "if he agreed to [get] some DNA samples." (Dkt. No. 52 at 113). However, "[t]he subjective intent underlying an officer's approach does not affect the seizure analysis." *United States v. Crandell*, 554 F.3d 79, 85 (3d Cir. 2009) (stating "a tip police receive[] that motivates their encounter with an individual merely serves to color the backstory at this stage").

The Supreme Court has stated that "the test for [the] existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628 (citing *Mendenhall*, 446 U.S. at 554); *see also Brown*, 448 F.3d at 245. This objective "'reasonable person' test presupposes an *innocent* person," *Bostick*, 501 U.S. at 438 (citation omitted), and looks at "all of the circumstances surrounding the encounter," *id.* at 437. Specific factors a court may consider include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (citations omitted). The location of the encounter may also be relevant. *See Bostick*, 501 U.S. at 437.

Recently, the Third Circuit explained that "[w]hether an individual has 'submitted' to a show of authority depends on both the nature of the show of authority as well as the suspect's conduct at the moment the officer asserted his or her authority." *Lowe*, 791 F.3d at 430-31. For example, "[w]hen a suspect flees after a show of authority, the moment of submission is often quite clear: It is when the fleeing suspect stops, whether voluntarily or as a result of the application of physical force." *Id.* (citing *Hodari D.*, 499 U.S. at 628-29). However, "different factors must be considered when an individual is already stationary, or 'when an individual's submission to a show of governmental authority takes the form of passive acquiescence.'" *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). "Thus, while 'a fleeing man is not seized until he is physically overpowered . . . one sitting in a chair may submit to authority by not getting up to run away.'" *Id.* (quoting *Brendlin*, 551 U.S. at 262).

### i. Moment of Seizure

The encounter at issue in this case began when Detective Joseph and three other VIPD officers approached Defendant near building 49 of the Mutual Homes housing community. (*See* Dkt. No. 52 at 25-26). During the suppression hearing, Detective Joseph testified that, when she and the three VIPD officers first approached Defendant, she introduced herself and the other officers as law enforcement and asked Defendant to identify himself. (*See id.* at 28).[20] According to Detective Joseph, Defendant initially stated "let me be" before responding that his name was Kareem. (*See id.* at 28, 86). Defendant argues that this statement, "let me be," was a clear indication that he did not want to speak with the officers. (*See* Dkt. No. 21 at 5).[21] The Court agrees. The combination of Defendant's express desire to be left alone and Detective Joseph's persistence in asking Defendant again to identify himself implies that Defendant was not free to refuse to respond. *See Johnson*, 332 F.3d at 206 (identifying an officer's persistent request to defendant to roll down his car window as the defining moment that the encounter turned into a seizure).

Although Defendant may have felt free to refuse, and did in fact initially refuse, to identify himself, the very next moment—when Detective Joseph persisted rather than accepting

---

[20] Defendant notes in his Motion to Suppress that, when Detective Joseph and the other officers approached him at Mutual Homes, they were "uniformed and armed." (Dkt. No. 21 at 5). However, this fact does not, without more, mean that Defendant was seized at that moment. *See United States v. Henderson*, 123 F. App'x. 459, 464 (3d Cir. 2005) (finding the defendant was not seized where officer "was in uniform and kept a hand on a holstered gun," but "did not initially call out or command [the defendant], attempt to touch him, tell him that he would detain him, or tell him that he was not free to go"). Detective Joseph testified at the suppression hearing that, when she first approached Defendant, neither she nor any of the other officers had any guns drawn. (*See* Dkt. No. 52 at 28, 114). Further, as the Supreme Court stated in *United States v. Drayton*, 536 U.S. 194 (2002), the fact that police officers are "in uniform or visibly armed" has "little weight" in the analysis of whether an encounter constitutes a seizure for purposes of the Fourth Amendment. *Id.* at 204-05 ("Officers are often required to wear uniforms and in many circumstances this is a cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public.").

[21] At the suppression hearing held on April 15, 2016, counsel for Defendant argued that, in addition to saying "let me be," Defendant attempted to walk away from the officers. This representation is not, however, consistent with the evidence of record. The record indicates that the only time Defendant walked away from the wall where he was sitting was when Detective Joseph requested that he walk over to the police car. (*See* Dkt. No. 52 at 29).

Defendant's choice not to acquiesce—the interaction became a seizure. *See Johnson*, 332 F.3d at 206. At that time, Detective Joseph made it clear to Defendant that he was not free to "disregard the police and go about his business," or "decline [her] requests or otherwise terminate the encounter." *Kim*, 27 F.3d at 951. Indeed, Detective Joseph candidly acknowledged during the suppression hearing on February 26, 2016 that she was not going to leave Defendant alone until he answered her questions. (*See* Dkt. No. 52 at 88). Under these circumstances, a reasonable person in Defendant's position would not have felt "free to leave." *Bostick*, 501 U.S. at 435.

"The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized." *Smith*, 575 F.3d at 313. Here, Defendant acquiesced to a show of authority when he responded to Detective Joseph's second request to identify himself by stating that his name was Kareem. (*See* Dkt. No. 52 at 28). Accordingly, the Court finds that the "moment of seizure" occurred in this case when Detective Joseph made it clear to Defendant that he was not free to refuse to respond to her request that he identify himself, and Defendant acquiesced. *See United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993) (finding acquiescence to a show of authority where defendant stood up and asked to go to the bathroom, officer told him to wait, and defendant sat back down).

### ii.    Reasonable Suspicion

"Police may only seize a person consistent with the Fourth Amendment if they have reasonable, articulable, and individualized suspicion that a suspect is engaged in criminal activity." *Lowe*, 791 F.3d at 434 (citing *Wardlow*, 528 U.S. at 123; *Terry*, 392 U.S. 1). Reasonable suspicion "is a less demanding standard than probable cause" *Alabama v. White*, 496 U.S. 325, 330 (1990), which is required for an arrest, *Wardlow*, 528 U.S. at 123. Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary

to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308, 47 V.I. 755 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330). A *Terry* stop is supported by reasonable suspicion if "an officer can 'articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Burton*, 532 F. App'x 171, 174 (3d Cir. 2013) (quoting *Wardlow*, 528 U.S. at 123-24).

In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court explained that the suspected criminal activity need not be in process. *Id*. at 227-28. Police officers may conduct a *Terry* stop to investigate "reasonable suspicion, grounded in specific and articulable facts," that an individual "was involved in or is wanted in connection with a completed felony." *Id*. at 229; *see also United States v. Serrano*, 598 F. App'x 72, 77 (3d Cir. 2015) ("The reasonable suspicion case law does not automatically prohibit police from stopping suspects to investigate past crimes."); *Brown*, 448 F.3d at 244 n.7 ("The *Terry* analysis applies here even though the crime in question had already been completed.").[22] In evaluating reasonable suspicion, courts must consider the

---

[22] At the suppression hearing held on April 15, 2016, counsel for Defendant argued that the crime Detective Joseph suspected Defendant of committing had occurred five days prior to the date she approached Defendant in Mutual Homes, and that there were, therefore, no exigent circumstances to justify the stop of Defendant. In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court addressed this issue stating:

> [T]he exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. . . .

> Despite these differences, where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice. Restraining police action until after probable cause is obtained would not only hinder the investigation, but might also enable the suspect to flee in the interim and to remain at large. Particularly in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible. The law enforcement interests at stake in these circumstances outweigh the individual's interest to be free of a stop and detention that is no more extensive than permissible in the investigation of imminent or ongoing crimes.

"totality of the circumstances"—i.e., the whole picture. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Before Detective Joseph and the other VIPD officers went to Mutual Homes on September 23, 2015, Detective Joseph had received information that Defendant was one of the perpetrators of the carjacking and the rape that occurred in Mutual Homes on September 17 and 18, 2015. First, on September 18, 2015, Detective Joseph received a detailed description of Defendant from S.S.— one of the victims in this case—immediately after the crime occurred. (*See* Dkt. No. 52 at 21). S.S. described Defendant as a tall, light-skinned, medium-built black male with dreadlocks, a six-point star tattoo, and hieroglyphic tattoos on his forearm. (*See id.*). Second, on September 21, 2015, Detective Joseph, received from members of the Mutual Homes housing community the first names of the suspects who committed the crime—including, the name Philmore. (*See id.* at 104). Third, on September 22, 2015, Detective Joseph received a tip from a concerned citizen who informed her that one of the suspects was a sex offender who had recently been released from jail on a rape conviction, and that his name was Philmore Archibald. (*See id.* at 22). Fourth, upon learning that one of the suspects was a sex offender, on September 22, 2015, Detective Joseph searched the sex offender registry with the name she was provided and discovered a photograph of "a red skin Rasta male, medium built with the star of David and [] writings on [his] arms." (*Id.* at 23). Detective Joseph testified at the suppression hearing that the photograph of the individual on the registry matched the name she received from the concerned citizen and the description she received from S.S., including the location of the tattoos on his body. (*Id.*). Fifth, Detective Joseph

---

*Id.* at 228-29. At the suppression hearing, counsel for Defendant attempted to distinguish the facts of *Hensley*—i.e., the wanted poster for the defendant and the fact that police were unable to locate him—from the facts of this case. However, the Court finds the differences between *Hensley* and this case inconsequential because the policy reasons underlying each scenario are the same. As aptly stated by the Court in *Hensley*: "Particularly[, as here,] in the context of felonies or crimes involving a threat to public safety, it is in the public interest that the crime be solved and the suspect detained as promptly as possible." *Id.* at 229.

learned from Edward Thomas ("Mr. Thomas"), the sex offender registrar for St. Croix, that Defendant had a Mutual Homes address. (*See id.* at 90).

When a *Terry* stop is based on a tip provided by an informant, the Third Circuit has instructed courts to "scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." *Serrano*, 598 F. App'x at 75 (quoting *United States v. Johnson*, 592 F.3d 442, 449 (3d Cir. 2010)). Several non-dispositive factors inform an assessment of the reliability of an informant's tip, including whether:

> (1) the information was provided to the police in a face-to-face interaction, allowing an officer to assess directly the informant's credibility;
> (2) the informant can be held responsible if his or her allegations are untrue;
> (3) the information would not be available to the ordinary observer;
> (4) the informant has recently witnessed the criminal activity at issue; and
> (5) the informant accurately predicts future activity.

*See United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) (citing *Brown*, 448 F.3d at 249-50); *see also Johnson*, 592 F.3d at 449 ("Though these factors all are relevant to our analysis, no single factor is dispositive or even necessary to render an informant's tip reliable."). These factors should not, however, be rigidly applied. *Serrano*, 598 F. App'x at 75. "Ultimately, the [c]ourt must ask whether the unknown caller's tip 'possessed sufficient indicia of reliability, when considering the *totality of the circumstances*, for [the court] to conclude that the officers possessed objectively reasonable suspicion sufficient to justify a *Terry* stop." *Id.* (quoting *Torres*, 534 F.3d at 211 (internal quotation marks omitted) (emphasis in *Torres*)).

Here, the anonymous tip at issue fails to satisfy almost all of the reliability factors. The tip came from a concerned citizen who called Detective Joseph anonymously. (*See* Dkt. No. 52 at 23). Therefore, Detective Joseph was unable to assess the credibility of the caller face-to-face, and could not hold him or her responsible if his or her allegations proved to be untrue. *See Florida v.*

17

*J.L.*, 529 U.S. 266, 275 (2000) (Kennedy, J., concurring) ("If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity."). Although the information that the anonymous caller provided Detective Joseph was not available to the ordinary observer—i.e., the sex offender status of Defendant and his name—there is no indication that the anonymous caller had witnessed the criminal activity at issue or that the anonymous caller accurately predicted future activity. Accordingly, the anonymous tip alone was insufficient to provide Detective Joseph with reasonable suspicion to stop Defendant. *See United States v. Robinson*, 562 F. App'x 72, 75 (3d Cir. 2014) ("Non-predictive anonymous tips, taken alone, are generally of insufficient probative value to warrant an investigatory stop.").

But the anonymous tip did not occur in isolation, and therefore should not be viewed in a vacuum. Notwithstanding that the tip provided by the concerned citizen on its own lacked "sufficient indicia of reliability," corroboration of the tip by Detective Joseph bolstered the reasonable suspicion necessary to justify the *Terry* stop of Defendant. *See White*, 496 U.S. at 332 (holding that the reliability of an anonymous tip increases when information provided to the police is later corroborated); *see also Johnson*, 592 F.3d at 450 ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided."). At the time Detective Joseph and the other VIPD officers approached Defendant outside of building 49 in the Mutual Homes housing community, they had: a detailed description of Defendant from one of the victims—including a description of the tattoos on his forearm; an image of Defendant from a search of the sex offender registry that matched the description Detective Joseph received from the victim and the name she received from the concerned citizen and members of the housing community; and confirmation from the sex offender registrar that Defendant had an address in Mutual Homes. Accordingly, considering the totality of the circumstances in this case, the Court

concludes that the tip provided by the concerned citizen, evidence by and together with the "corroboration of certain details," provided reasonable suspicion to support the *Terry* stop of Defendant.

### iii.   *De Facto* Arrest

"A *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *Johnson*, 592 F.3d at 451 (citing *Terry*, 392 U.S. at 28 ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.") (other citation omitted). Here, Defendant argues that he was under *de facto* arrest, which requires probable cause, when he was transported to the police station. (Dkt. No. 21 at 7). Specifically, Defendant states that "[t]he Supreme Court held that the 'reasonable suspicion' which permits a limited stop under *Terry v. Ohio*, 392 U.S. 1 (1968), is not enough to allow the police to transport the person stopped to the police station and extract information through detention interrogation." (*Id.* (quoting *Deputy v. Taylor*, 19 F.3d 1485, 1491 (3d Cir. 1994) (internal quotation marks omitted)).

In *United States v. Johnson*, 592 F.3d 442 (3d Cir. 2010), the Third Circuit addressed the relative intrusiveness of an officer's conduct, explaining that

> an excessively intrusive *Terry* stop is not unconstitutional because its overly broad scope necessarily places a suspect under *de facto* arrest without probable cause . . . . Rather, an improperly executed *Terry* stop violates the Fourth Amendment because its scope is generally unreasonable under all of the circumstances.

*Johnson*, 592 F.3d at 452 (citations omitted). The Court further explained that courts must

> review the manner in which the [] police conducted the *Terry* stop at issue [] to determine whether it was reasonably related in scope to the initial justification for the stop and the officers' legitimate concerns for the safety of themselves and the general public.

*Id.* (citing *Terry*, 392 U.S. at 19-20, 24-25; *United States v. Sharpe*, 470 U.S. 675, 685-87 (1985)).

During a *Terry* stop, "police officers may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Holyfield*, 267 F. App'x 130, 135 (3d Cir. 2008) (quoting *United States v. Edwards*, 53 F.3d 616, 618 (3d Cir. 1995) (internal quotation marks omitted)). In *Murphy v. Mifflin County Regional Police Department*, 548 F. App'x 778 (3d Cir. 2013), the Third Circuit explained that placing a suspect in handcuffs for transport to the police station does not "necessarily transform an investigatory seizure into a formal arrest requiring probable cause," and "relocating [the defendant] to the police station to continue the investigation did not convert his detention into an arrest." *Id.* at 781 (citing, *inter alia*, *Florida v. Royer*, 460 U.S. 491, 504-05 (1983) ("[T]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area.")).

Viewed in the context of the circumstances present here, the Court finds that it was reasonable to handcuff and transport Defendant to the police station—a secure and safe area—for further investigation. Detective Joseph testified at the suppression hearing that, in the interest of safety, she decided to leave the Mutual Homes housing community with Defendant because a crowd began to gather.  (*See* Dkt. No. 52 at 30). She explained that the VIPD has "had situations in Mutual Homes before where mini riots broke out," specifically stones had been thrown at the police and "a police car was shot up." (*Id.*). Although, "as a matter of procedure," Defendant was frisked, handcuffed, and placed in the police car for transport (*id.* at 30, 91), Detective Joseph testified that Defendant was told several times that he was not under arrest (*see id.* at 30-31, 33). She further testified that, upon his arrival at the police station, Defendant was uncuffed. (*See id.* at

20

31). Once at the police station, there is no indication that the detention of Defendant lasted longer than necessary to effectuate its purpose. *See Royer*, 460 U.S. at 500 (stating that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"). In fact, he was released and taken back to the Mutual Homes area, as requested, shortly after his photograph and DNA sample were taken. (*See* Dkt. No. 52 at 37).

In light of the foregoing, the conduct of Detective Joseph and the other VIPD officers does not rise to the level of a *de facto* arrest under the Fourth Amendment. *Cf. Johnson*, 592 F.3d at 447-48 (holding no *de facto* arrest occurred where the police encircled the car, drew their weapons, yelled at the occupants, and handcuffed the suspect). Accordingly, a reasonable person, standing in Defendant's shoes, would have understood that he was being briefly detained for investigation, and was not under arrest.

### B. Totality of the Circumstances

The remaining issues require the Court to consider the totality of the circumstances surrounding Defendant's interactions with Detective Joseph and the other VIPD officers on September 23 and 24, 2015. The Court finds that the following context is pertinent to its analysis:

- On September 23, 2015, Defendant was approached at the Mutual Homes housing community by Detective Joseph and three other VIPD officers, who asked Defendant to accompany them to the police station. (*See* Dkt. No. 52 at 28, 30). Defendant was told by Detective Joseph at least "two or three times," and once by another officer, that he was not under arrest. (*Id*. at 30-31, 33). Detective Joseph explained to Defendant that she and the other officers needed to take him to the police station to talk to him, and that, "as a matter of procedure," he had to be handcuffed. (*Id*. at 30). Upon his arrival at the police station, Defendant was uncuffed. (*See id*. at 31).

- While at the police station, Detective Joseph asked Defendant where he lived, but did not ask Defendant any questions about the incident that occurred at Mutual Homes on September 17 and 18, 2015. (*See id*. at 32-33). Rather, she explained to Defendant that he was a suspect in a rape case that occurred in the Mutual Homes housing community, and that to eliminate him as a suspect she needed his photograph and DNA. (*See id*. at 31, 88).

- Defendant asked Detective Joseph what would happen if he did not give her a photograph or DNA sample. (*See id*. at 31). Detective Joseph explained: "[I]f you don't want to give it to me, it's okay," but "I will go to the court and get a court order ordering you to give it to me." (*Id*. at 113, 31). Defendant responded: "So, you going [to] get it anyway?" (*Id*. at 31). Detective Joseph answered in the affirmative. (*Id*.). Defendant then stated: "If you're going to get it anyway, I going to give it to you." (*Id*. at 31-32).

- Defendant signed two authorization forms—one for the photograph and the other for the DNA sample. (*See id*. at 32). He then proceeded to swab the inside of his mouth for DNA, and a photograph was taken of him. (*See id*.). Once Defendant provided his DNA sample and his photograph, Defendant told Detective Joseph that he had been cooperating with the sex offender registrar, Mr. Edward Thomas, by calling Mr. Thomas on a regular basis. (*See id*.). Defendant further stated that Mr. Thomas knew where he lived; Detective Joseph could verify his address with Mr. Thomas; and he would call Detective Joseph in the morning to provide her with better directions to his home. (*See id*.).

- Defendant was taken back to the Mutual Homes area—near a fire station, which is where Defendant asked the officers to take him. (*See id*. at 37). As Defendant was being transported back to the Mutual Homes area, he asked Detective Joseph for her telephone number and told her that he would call her the following day—September 24, 2015—to verify that she had spoken to Mr. Thomas and provide "whatever assistance [Detective Joseph] needed." (*Id*. at 37-38).

- On September 24, 2015, Defendant called Detective Joseph twice to find out if Mr. Thomas had contacted Detective Joseph and to see if there was "anything else he could do to help." (*Id*. at 44). Detective Joseph was unavailable the first time that Defendant called, but Detective Joseph told Defendant to call back. (*See id*.). Defendant did call back and stated to Detective Joseph that he "wanted to speak." (*Id*.). Defendant told Detective Joseph that "he was by the fire station" and requested that she pick him up. (*Id*. at 44-45). Detective Joseph and two other officers drove to pick up Defendant. (*See id*. at 45). Once Defendant arrived at the police station, Defendant was advised of his *Miranda* rights by Detective Joseph and told: "[Y]ou don't have to speak with me if you don't want to." (*Id*.). Defendant stated that he understood his rights, signed an "Advice of Rights" form, and gave a statement. (*See id*.).

In the context of the foregoing circumstances, the Court will address each of Defendant's arguments.

### 1.  Custodial Interrogation

Defendant contends that he was "in custody" and subjected to a "custodial interrogation," without first being advised of his *Miranda* rights, on September 23, 2015 when Detective Joseph and the other VIPD officers transported him from Mutual Homes to the police station. Defendant

asserts that any statements he made on September 23, 2015, as a result of the custodial interrogation, and without *Miranda* warnings, must be suppressed. In response, the Government argues that Defendant was not "in custody" or subjected to a "custodial interrogation" that required *Miranda* warnings. The Government asserts that Defendant was brought to the police station to confirm or dispel the belief of the police that he was involved in the crimes that occurred at Mutual Homes on September 17 and 18, 2015.

In *Miranda v. Arizona*, the Supreme Court established the now well-recognized legal principle that, under the Fifth Amendment, the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). A custodial interrogation has been defined as an "inquiry [] conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought" held in "custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (citing *Miranda*, 384 U.S. at 467; *Garner v. United States*, 424 U.S. 648, 657 (1976)).

The Supreme Court has explicitly stated that law enforcement officers "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). *Miranda* warnings are only required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the Government." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (citations omitted); *see also United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) ("*Miranda* warnings are designed to protect against the evils of 'custodial interrogation,' and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the

police's traditional investigatory functions."). A suspect is "in custody" when "there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

In the instant case, Defendant argues that he was "in custody" and subjected to a "custodial interrogation" because he was brought to the police station, which counsel for Defendant characterized as "a very coercive environment." However, "a noncustodial situation is not converted to one in which *Miranda* applies . . . simply because the questioning takes place in the station house[.]" *Mathiason*, 429 U.S. at 495. As the Third Circuit has explained,

> the key aspect of [a] custodial setting . . . is the isolation of the suspect in a room that is dominated by [] law enforcement officials who will interrogate him. In this setting, the police have immediate control over the suspect—they can restrain him and subject him to their questioning and apply whatever psychological techniques they think will be most effective.

*Mesa*, 638 F.2d at 585-86. Thus, "at a minimum, the police must have immediate control over the suspect . . . and the proper inquiry to determine whether [an individual] is in custody is not to ask if he was at the police station, but to ask if he was free to leave." *Id*. at 587.

Here, Defendant went to the police station with the officers upon the request of Detective Joseph. (*See* Dkt. No. 52 at 30). He was told at least "two or three" times by Detective Joseph, and another time by one of the other officers, that he was not under arrest. (*Id*. at 30-31, 33). Although Defendant was handcuffed "as a matter of procedure" while he was transported to the police station (*id*. at 30), he was uncuffed upon his arrival (*see id*. at 31). In addition, when he arrived at the police station, he was told the purpose of the investigatory stop, which was that he was a suspect in a rape case that occurred in the Mutual Homes housing community, and that to eliminate him as a suspect the officers needed his photograph and DNA. (*See id*. at 31, 88). Once Defendant

24

provided the photograph and DNA sample, Detective Joseph and the other VIPD officers took him

back to the Mutual Homes area, which is where Defendant asked to be taken. (*See id*. at 37).

Based on the record before the Court, the Court concludes that Defendant was not in

custody within the meaning of *Miranda*. Specifically, the Court finds that Defendant was not in

the kind of coercive setting that the Third Circuit has concluded would place him within the

"immediate control of the police." *Mesa*, 638 F.2d at 588; *see also Mathiason*, 429 U.S. at 495

(finding the fact that the defendant had come to the police station upon the request of the police;

was told he was not under arrest; and left the police station after questioning indicated that he had

not been subjected to a "custodial interrogation," even though he had been questioned at the police

station for half an hour). Accordingly, the Court finds that *Miranda* warnings were not required

and, therefore, will not suppress any statements made by Defendant on September 23, 2015.

### 2.  Waiver of *Miranda* Rights

At the suppression hearing held on April 15, 2016, counsel for Defendant argued that

Defendant did not voluntarily sign an "Advice of Rights" form, waiving his *Miranda* rights, on

September 24, 2015 (*see* Gov't Ex. 5), because the actions of Detective Joseph on September 23,

2015 communicated to Defendant that he did not have *Miranda* rights. Specifically, counsel,

relying on the testimony of Detective Joseph, argued that Defendant felt compelled to answer

questions at the police station because of his sex offender status, and that Detective Joseph never

dispelled Defendant of this belief. Accordingly, Defendant contends that any statements that he

made on September 24, 2015 must be suppressed.

As discussed above, a person subject to custodial interrogation must be informed of his

rights under *Miranda*. *See* 384 U.S. at 479. A person may, however, "waive effectuation of these

rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*. at 444; *see also*

*United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). "Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741, 41 V.I. 446 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986).

To prove a valid waiver, the Government has the burden of establishing that the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Briscoe*, 69 F. Supp. 2d at 741 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (internal quotation marks omitted)); *see also United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012). The Supreme Court has characterized this as a "heavy burden." *Miranda*, 384 U.S. at 475; *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (stating that "the prosecution's burden is great").

To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." *Briscoe*, 69 F. Supp. 2d at 741 (quoting *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998)). Specifically, courts consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id*. (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). Examples of "traditional" indicia of coercion are the duration and conditions of detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting his powers of resistance and self-control. *Id*. at 741 n.1 (citing *Spring*, 479 U.S. at 574).

In support of the argument that Defendant did not voluntarily waive his *Miranda* rights on September 24, 2015 because he felt compelled to answer questions as a result of his sex offender status, counsel for Defendant relies on the following excerpt of Detective Joseph's suppression hearing testimony:

> Q      You made it pretty clear to him, until you could clear him up, you was going to continue to deal with him the way you see fit, right?
> A      Part of the things that he was told as a sex offender in the registry, he was told that he would have to answer questions. He, himself, told me that Agent Thomas told him that. So, he knew that, because that's what he said, when he mentioned the rape, that he didn't do anything. We always picking on him, and only because he was a sex offender. So those types of questions were something he knew was going to come to him just because of his status.

(Dkt. No. 52 at 88). However, a full reading of Detective Joseph's testimony on this issue does not compel the conclusion that Defendant believed that he had to relinquish his *Miranda* rights, but rather that he knew the police would consider him a possible suspect of the rape that occurred in Mutual Homes because of his sex offender status, and question him:

> Q      So you told him as a sex offender –
> A      Not. No, I never told him that. I'm telling you what he, himself, told me.
> Q      Okay.
> A      He, Philmore Archibald, told me, Naomi Joseph, that he knew that he would be identified as a possible suspect, because he was a sex offender. And he knew that we were going to come to speak to him. He told me that I never told him that.
> Q      He told you that at the station though, didn't he, Detective Joseph?
> A      He said it at the scene, I ain't got nothing to do with this rape. All you always picking on me.
>          When we got to the station and when he was cooler and calmer, he explained why he was angry. And in his utterance, he said that he knew that we would eventually come to speak to him, because of his sex offender status.
> Q      Okay. You're telling me that you did not bring up the issue of his sex offender status?
> A      I didn't have to. He did.

(*Id*. at 88-89).

Further, there is more than ample evidence in the record to support the conclusion that, under the totality of the circumstances, Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights before making a statement on September 24, 2015. For example, Detective Joseph testified that, as Defendant was being transported back to the Mutual Homes area on September 23, 2015, he asked Detective Joseph for her telephone number and told her that he would call her the following day—September 24, 2015— to verify that she had spoken to Mr. Thomas, the sex offender registrar, and provide her with "whatever assistance [she] needed." (Dkt. No. 52 at 37-38). Defendant did, in fact, call Detective Joseph twice the next day to find out if Mr. Thomas had contacted Detective Joseph and to see if there was "anything else he could do to help." (*Id*. at 44). When Detective Joseph was unavailable the first time that Defendant called, Defendant called Detective Joseph back and stated that he "wanted to speak." (*Id*.). Detective Joseph testified that Defendant told her that "he was by the fire station" and requested that she pick him up. (*Id*. at 44-45). Once Defendant arrived at the police station, Detective Joseph testified that she advised Defendant of his *Miranda* rights and that Defendant stated that he understood his rights, signed an "Advice of Rights" form, and gave a statement. (*See id*. at 45).

The Court credits the testimony of Detective Joseph that Defendant was read his *Miranda* rights; stated that he understood his rights; and signed a form that waived those rights. The credibility of Detective Joseph's statement is supported by the spirit of cooperation displayed by Defendant in offering to provide "whatever assistance [Detective Joseph] needed" and in returning, at his own request, to the police station on September 24, 2015 "to speak." (*Id*. at 38, 44). Considering the totality of the evidence, the Court finds that the Government has met its burden of proving by a preponderance of the evidence that Defendant made a voluntary, knowing, and

intelligent waiver of his *Miranda* rights, and, therefore, will not suppress the statements Defendant made on September 24, 2015.

### 3. Voluntariness of Consent

Defendant argues that, although he signed two authorization forms—one for his photograph (Gov't Ex. 3) and the other for his DNA sample (Gov't Ex. 4)—he did so only after Detective Joseph told him that she would get a court order requiring Defendant to provide the photograph and DNA sample. Therefore, he felt he had no choice but to consent to the taking of his photograph and DNA sample. In response, the Government contends that Defendant was not coerced into consenting, but rather, after weighing his options, he made a deliberate choice to sign the authorization forms.

When consent is asserted as the lawful basis for obtaining evidence, the Government "has the burden of proving [by a preponderance of the evidence] that the consent was . . . freely and voluntarily given." *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (internal quotation marks omitted)); *see also United States v. Matlock*, 415 U.S. 164, 177 (1974). The voluntariness of consent is determined by "examining the totality of the circumstances," including "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Id.* at 278 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The "setting in which the consent was obtained," as well as "the parties' verbal and non-verbal actions" are also relevant. *Id.* (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003) (internal quotation marks omitted)).

29

Here, Detective Joseph testified that before Defendant signed the two authorization forms, he asked her what would happen if he did not give her a photograph or DNA sample. (Dkt. No. 52 at 31, 92). Detective Joseph testified that she explained to Defendant: "[I]f you don't want to give it to me, it's okay," but "I will go to the court and get a court order ordering you to give it to me." (*Id.* at 113, 31). Defendant responded: "So, you going [to] get it anyway?" (*Id.*). On cross-examination, Detective Joseph testified that she "basically told him yes." (*Id.* at 93). According to Detective Joseph, Defendant then stated: "If you're going to get it anyway, I going to give it to you." (*Id.* at 31-32).

Under Third Circuit jurisprudence, "it is well-established that when evidence shows that a person believes [he or] she must consent to a search, this 'weighs heavily against a finding that consent was voluntarily given.'" *United States v. Noe*, 342 F. App'x 805, 807 (3d Cir. 2009) (quoting *United States v. Molt*, 589 F.2d 1247, 1251 (3d Cir. 1978)). In *United States v. Sebetich*, 776 F.2d 412 (3d Cir. 1985), the Court "expressed concern that statements by law enforcement officers suggesting that acquiring a warrant would be a foregone conclusion might convey an impression that the individual has no choice but to consent." *Id.* (citing *Sebetich*, 776 F.2d at 425). However, the Court clarified "that a statement by an officer that he would merely *attempt* to obtain a warrant would not weigh against a finding of voluntary consent." *Id.* (emphasis in original); *see also United States v. Claus*, 458 F. App'x 184, 189 (3d Cir. 2012) (finding officers' suggestion that search warrant would "most likely issue" was not an affirmative representation "insinuating that the defendant had no choice but to consent"; the officers merely provided a permissible "appraisal of the realities" the defendant faced).

Notwithstanding these concerns, even in situations where the "police possess an invalid search warrant or falsely claim that they can obtain one," the Third Circuit has "expressly declined

to 'establish a blanket rule that . . . voluntariness is necessarily vitiated[.]" *Noe*, 342 F. App'x at 807 n.4 (quoting *Sebetich*, 776 F.2d at 424). The Court explained that the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), "mandates consideration of all the surrounding circumstances." *Id.* (citing *Sebetich*, 776 F.2d at 424); *see also Schneckloth*, 412 U.S. at 248-49 (stating that "[v]oluntariness is a question of fact to be determined from all the circumstances"). Thus, even if a government agent had, indeed, suggested that the ability to obtain a warrant was a foregone conclusion, that would "constitute but one factor in the overall determination of voluntariness of the consent." *Noe*, 342 F. App'x at 807 n.4.

In the instant case, even if the statement by Detective Joseph that she would "go to the court and get a court order ordering [Defendant]" to give her a photograph and DNA sample can be viewed as suggesting that obtaining an order was a "foregone conclusion," the totality of the circumstances indicate that, once Defendant arrived at the police station, he exhibited a willingness to fully cooperate with the police. Specifically, Detective Joseph testified that Defendant was "cool[] and calm[]" at the police station and that the conversation about consent was "casual and calm" rather than an "antagonistic type [of] confrontation." (Dkt. No. 52 at 89, 93). She also testified that Defendant was not physically restrained when consent for his photograph and DNA sample was requested, and that she told Defendant he did not have to consent to the taking of his photograph or DNA if he did not want to:

> Q    Now, at the station with, when the defendant was there, you asked him for, to consent to give the photograph and DNA sample?
> A    Yes, ma'am.
> Q    Did you tell him he could or he couldn't?
> A    Yeah. He asked me. I told him, yeah, I mean, if you don't want to give me, it's okay, but I told him that I would eventually get it. Because he asked.

(Dkt. No. 52 at 31, 113). Accordingly, the "non-verbal actions" of Defendant, reflected in his cool and calm demeanor, the non-confrontational "setting in which the consent was obtained," and the

31

fact that Defendant was explicitly informed that he did not have to consent indicate that Defendant voluntarily gave his consent to the taking of his photograph and DNA sample. *See Price*, 558 F.3d at 278.

It is worthy of note that, after Defendant provided his photograph and DNA sample, Detective Joseph and the other VIPD officers drove Defendant back to the Mutual Homes area, which is where he asked to be taken (*see* Dkt. No. 52 at 37), and that Defendant, as he was being transported back to the Mutual Homes area, asked Detective Joseph for her telephone number and told her that he would call her the following day and provide her with "whatever assistance [she] needed" (*id*. at 37-38). Defendant did, in fact, call Detective Joseph twice on September 24, 2015 to find out if there was "anything else he could do to help," and requested that she pick him up. (*Id*. at 44-45). These facts—albeit after consent was given—add further context to the tenor of the interactions between Defendant and the officers and provide additional support for the Court's conclusion that Defendant was not intimidated or coerced in any way into giving consent. *See Noe*, 342 F. App'x at 809 (finding defendant's live-in girlfriend voluntarily consented to the seizure of defendant's weapons—despite contradictory testimony that agents threatened to secure a warrant if she refused consent—because she, *inter alia*, affirmatively testified that she wanted to "cooperate" with the agents).

Given the totality of the circumstances, the Court concludes that the Government has established, by a preponderance of the evidence, that consent was voluntarily given by Defendant. Accordingly, the photograph and DNA sample of Defendant will not be suppressed.[23]

---

[23] In his Motion to Suppress, Defendant moves to suppress the contents of the cell phone that was recovered from his body on the date of his arrest. (Dkt. No. 21at 9). However, at the suppression hearing, Defendant, after acknowledging that Detective Joseph testified that she obtained a warrant to search the cell phone (Dkt. No. 52 at 49), did not pursue the argument further.

## III.   CONCLUSION

For the foregoing reasons, the Court will deny Defendant's "Motion to Suppress Physical Evidence and Statements." (Dkt. No. 21).

An appropriate Order accompanies this Memorandum Opinion.

Date: June 3, 2016                                    _____/s/_____
                                                      WILMA A. LEWIS
                                                      Chief Judge